Filed 8/22/23  P. v. Zena CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KIIAIYONA C. ZENA,<br><br>    Defendant and Appellant. | D080795<br><br><br>(Super. Ct. No. SCE384235) |

APPEAL from a judgment of the Superior Court of San Diego County, John M. Thompson, Judge.  Affirmed.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Laura Baggett and Robin Urbanski, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Kiiaiyona C. Zena challenges her convictions for felony assault and felony battery based on instructional error.  She contends the trial court's use

of the mutual combat instruction, CALCRIM No. 3471, was not supported by the evidence and prejudicially reduced the prosecution's burden of proof on the self-defense element.

We conclude that substantial evidence supports the trial court's giving of the mutual combat instruction, and that the instruction did not lower the prosecution's burden in proving Zena did not act in self-defense. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The People's Case*

Zena and K.J. are sisters. In 2016, Zena, her boyfriend, and her two children briefly stayed with K.J. After about two weeks, K.J. said she noticed her utility bill was high and asked Zena over the telephone to contribute $50. Zena became upset, and the call ended without a resolution. About 10 minutes later, K.J. claimed Zena and her family "came busting through [her] door." She said Zena was very angry and pushed her. K.J. grabbed a pair of needle-nose jewelry pliers to defend herself, but then Zena knocked her down. K.J. was face down with Zena on her back. When she realized she could not breathe, K.J. swung her right hand over her shoulder with the jewelry pliers and stabbed Zena in the face and back. Zena then got up, and K.J. felt blood trickle on her.

The family left, and K.J. learned about a month later that Zena had obtained a restraining order against her. The sisters did not have any contact after that until 2018.

In September 2018, K.J. accompanied her boyfriend, A.F., to the laundromat. She walked to another sister's house nearby to retrieve a pot and then returned to the laundromat. When she arrived, A.F. was waiting for her in front of the building and told her, "your sister's here." K.J. knew he

2

meant Zena. She retrieved her keys from A.F. and went to put the pot in her car, at which point she saw Zena and her family.

Zena said, "You don't remember you cut my face?" She then repeatedly reminded K.J. that she had a restraining order. K.J. said at that point she wanted to leave, so she walked toward the laundromat entrance intending to tell A.F. she was leaving and give him her keys. She had to walk by Zena, who then approached her and hit her in the face with a closed fist. K.J. said she was dazed for a minute, and then Zena's daughters[1] and boyfriend started hitting her as well. She hunched forward to protect her face. At some point during the same time frame, Mikqueen said, "Mom, she has [her] keys. She's going to cut you" and then, at Zena's direction, pulled the keys from K.J.'s hand. The group continued hitting and kicking K.J. and pulled out some of her hair. She said she did not fight back.

K.J. called for help, and her boyfriend came out of the laundromat. A.F. and Zena's boyfriend then got into an altercation. Afterwards, K.J. called 911.

An ambulance transported K.J. to the hospital where she was diagnosed with a "blowout fracture" of the orbital floor, meaning the bone that supported her eye had been pushed down. She underwent plastic surgery to have the bone moved back into place and remained hospitalized for three days. K.J. continues to suffer vision problems in her left eye.

---

[1]  Zena's older daughter, Mikqueen Hopper, was her codefendant in the case but is not a party to the instant appeal. Because the younger daughter's surname is also Hopper, we refer to Mikqueen by her first name solely for purposes of clarity.

B.    *The Defense Case*

Zena testified on her own behalf.  She explained that after she refused to pay the utility bill, she arranged to retrieve her things at the apartment.  When she arrived, she said K.J. slammed open the screen door, which ran over her foot and cut it open.  She claimed K.J. then stabbed her in the face with needle-nose pliers, and they started fighting.  During the fight, K.J. also stabbed her in the back.  After Zena left, she did not call the police or go to the hospital.  According to Zena, she obtained a restraining order because K.J. subsequently harassed her and her children over the telephone.

On the day of the laundromat incident, Zena was there with her daughters and boyfriend.  She said K.J. was about 10 to 12 feet away when she first saw her.  Zena claimed K.J. came toward her with her keys protruding from her fingers "like wolverine claws."  Mikqueen said, "Mom, she's going to stab you in your face again."  Zena explained that she had just enough time to take off her shoes and glasses before the fight started.  K.J. then scratched the side of Zena's nose with her keys at which point Zena said she "just lost it" and they started fighting.  Zena acknowledged that she punched K.J. while holding her by the hair, but said that K.J. then punched her back.  She also admitted she punched K.J. in the face and estimated the sisters each hit each other five or six times.  Zena claimed the only reason she punched K.J. was to defend herself.

According to Zena, her younger daughter was not involved in the fight, and Mikqueen did not strike K.J.; she only took the keys away from her.  Zena said the fight ended when A.F. and Zena's boyfriend almost got into a fight.

On cross-examination, Zena acknowledged that even after Mikqueen took K.J.'s keys away, she "beat up" her sister, pulled her hair, and punched

4

her.  She said she has "always been scared of [K.J.]" since K.J. stabbed her in the face and back.  As a result, she feared K.J. would have stabbed her in the back with the keys had she turned to leave.  Zena confirmed that, in speaking to a police officer about what happened, she had said, "my first instinct was to fight her."

C.    *The Mutual Combat Instruction, Verdict, and Sentencing*

During a jury instruction conference, the prosecutor asked the trial court to deliver CALCRIM No. 3471, the mutual combat instruction, because he believed there was a "version of the facts" under which the jury could find that the "assault began as mutual combat."  Counsel for both defendants objected, and the court initially indicated it did not see how the instruction was applicable to the parties.  The prosecutor then explained that, if the jurors believed the assault began as mutual combat, they would "be wondering what the rules are if two people agreed to fight."  He reasoned that they would "need instruction on how to resolve the legal question of what happened after mutual combat had ended."

The court agreed to give the instruction, at which point Zena's counsel argued there was no evidence that anyone agreed to fight.  The prosecutor pointed out that "[K.J.] testified that the defendant attacked her, but she didn't want to fight.  The defendant testified that [K.J.] attacked her, and that the defendant didn't want to fight."  Over the defense's objection, the court confirmed it would give the instruction.

After closing arguments, the trial court instructed the jury with, among other instructions, CALCRIM No. 3471, as follows:

> "A person who engages in mutual combat or starts a fight has a right to self-defense only if, one, she actually, and in good faith, tried to stop fighting.

5

"Two, she indicated by word or conduct to an opponent in a way that a reasonable person would understand that she wanted to stop fighting, and that she had stopped fighting.

"And, three, she gave her opponent a chance to stop fighting.

"If a defendant meets these requirements, then she had a right of self-defense if the opponent continued the fight.

"A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied, and must occur before the claim of self-defense."

In closing, the prosecution argued that, "even if you were to find that Defendant Zena and [K.J.] started fighting mutually at the beginning, even if you were to find that [K.J.] did throw the first punch, which is not what happened, but even if you concluded that, Defendant Zena is still guilty of battery causing serious bodily injury and assault likely to cause [great bodily injury]. [¶] Because based on Defendant Zena's description of what happened, she starts fighting with [K.J.]. Defendant [Mikqueen] starts trying to take [K.J.'s] keys away. And according to Defendant Zena's testimony, those keys were the thing that concerned her. According to her testimony, she was fixated on those keys. And according to her testimony, according to Defendant Zena's testimony, Defendant [Mikqueen] did successfully, eventually successfully, get those keys away from [K.J.]. And after the [*sic*] [Mikqueen] removed the keys from [K.J.], according to Defendant Zena's testimony, Defendant Zena beat up her sister. [¶] . . . [¶] So under no version of events did the defendants act in self-defense."

The jury convicted Zena of assault by means likely to produce great bodily injury (Pen. Code,[2] § 245, subd. (a)(4); count 1) and found true the allegations that she personally inflicted great bodily injury upon K.J. (§§ 12022.7, subd. (a) & 1192.7, subd. (c)(8)). It further found Zena guilty of battery with serious bodily injury (§ 243, subd. (d); count 2) and found true the allegation that she personally inflicted great bodily injury upon K.J. (§ 1192.7, subd. (c)(8).)

In July 2022, the trial court sentenced Zena to three years of formal probation with 180 days in custody.

## DISCUSSION

Zena contends the trial court violated her right to due process by delivering the mutual combat instruction over her objection. In particular, she argues the instruction was unsupported by the evidence and effectively reduced the prosecution's burden of proof on the self-defense element. We disagree.

We review assertions of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579; *People v. Marquez* (2023) 89 Cal.App.5th 1212, 1218.) "When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229 (*Houston*).) We also presume jurors understand and follow the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 (*Sanchez*).)

Even if an instruction correctly states a principle of law, if it has no application to the facts of the case, it is an error to offer it. (*People v. Guiton*

---

2    Statutory references are to the Penal Code.

7

(1993) 4 Cal.4th 1116, 1129.) Thus, "instructions *not* supported by substantial evidence should not be given." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1050 (*Ross*).) Substantial evidence is "evidence that would allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof." (*People v. Cole* (2004) 33 Cal.4th 1158, 1206 (*Cole*).) "Stated differently, we must determine whether a reasonable trier of fact could have found beyond a reasonable doubt that defendant committed [the offense based on the proffered theory]." (*Ibid*.)

In this case, Zena maintains *Ross*, *supra*, 155 Cal.App.4th 1033 is dispositive of this issue. In *Ross*, the defendant had been arguing with a woman when she slapped him, whereupon the defendant punched her, breaking her cheekbone. (*Id.* at p. 1036.) The defendant was convicted of aggravated assault and battery after the trial court, over defense counsel's objection, instructed the jury that a person engaged in "mutual combat" cannot claim self-defense unless he has first undertaken to withdraw from the conflict and inform his opponent he has stopped fighting. (*Id.* at p. 1042 and fns. 8 & 9.) The trial court refused the deliberating jurors' request for a legal definition of "mutual combat," telling them there was no legal definition and instead to rely on the common, everyday meaning of these words.[3] (*Ross*, at p. 1043.)

The *Ross* court held this was error. It found the phrase "mutual combat" was "too broad to convey the correct legal principle." (*Ross*, *supra*, 155 Cal.App.4th at p. 1044.) The jury therefore was "left . . . free to suppose

---

3    When *Ross* was decided, *former* CALCRIM No. 3471 did not include a definition of "mutual combat," unlike the current version given by the trial court in this case.

8

that any exchange of blows disqualifies both participants from claiming a right of self-defense. In fact the doctrine applies only to a violent confrontation conducted pursuant to prearrangement, mutual consent, or an express or implied agreement to fight." (*Id*. at p. 1036.)

The court further concluded the phrase " 'mutual combat' is not only ambiguous but a misnomer. The mutuality triggering the doctrine inheres not in the combat but in the *preexisting intent to engage in it*." (*Ross, supra,* 155 Cal.App.4th at p. 1045.) It thus found that, for a mutual combat instruction to be appropriately given, "there must be evidence from which the jury could reasonably find that *both combatants actually consented or intended to fight before the claimed occasion for self-defense arose*." (*Id*. at p. 1047.) Because the evidence before the court was insufficient to establish such an arrangement or agreement, and the reviewing court concluded there was a substantial basis for the jury to find that the defendant acted in self-defense, the court found it reasonably probable that a properly instructed jury would have returned a more favorable verdict to defendant. (*Id*. at p. 1036.)

By contrast, the record in the instant case contains substantial evidence from which reasonable jurors could infer the existence of an implied agreement to fight. (*Cole, supra,* 33 Cal.4th at p. 1206.) Both women acknowledged having a contentious history. They had not seen each other since the conflict in 2016, which Zena immediately brought up, saying "[y]ou don't remember you cut my face?" She then repeatedly reminded K.J. that she had a restraining order.

K.J. acknowledged that, although she knew she was supposed to stay one hundred yards away from Zena, she walked towards Zena's group and tried to go around them instead of leaving the area. In so doing, she said she

9

put two fingers through the loop of her key ring and held her three "sharp" keys in her hand. If the jury believed Zena's testimony, K.J. was holding the ring with the keys protruding between her fingers "[l]ike wolverine claws." Additionally, both sisters agreed Mikqueen issued a warning regarding the keys to the effect of: "Mom, she's going to stab you in your face again." K.J. also confirmed that her mindset at the time was that she was not going to let go of her keys. A jury could reasonably construe K.J.'s actions as demonstrating an intent to fight. (*Ross*, *supra*, 155 Cal.App.4th at p. 1047.)

The same is true of Zena's actions. Zena testified that she only just had time to take her shoes and glasses off before the fight started. Although she argues these acts are not evidence of a prearranged agreement to fight, the jury was instructed that the definition of mutual combat included an implied agreement and a jury could view these actions as showing her "implied agreement to fight." (*Ross*, *supra*, 155 Cal.App.4th at p. 1036.) Further, according to Zena's version of events, even though K.J. initiated the fight by scratching the side of Zena's nose with her keys, Zena then "just lost it." She told police officers that when she saw her sister, "[her] first instinct was to fight her." Moreover, under both versions of events, the fight started almost immediately. Viewing this evidence collectively, a reasonable jury could have found beyond a reasonable doubt that both sisters demonstrated an "inten[t] to fight before the claimed occasion for self-defense arose." (*Id.* at p. 1047, italics omitted.) As a result, we conclude the mutual combat instruction was supported by substantial evidence (*Cole*, *supra*, 33 Cal.4th at p. 1206) and the trial court, therefore, did not err by providing this instruction. (*Ross*, at p. 1050.)

We also disagree that the mutual combat instruction had the effect of lowering the prosecution's burden of proof on the self-defense element. If the

10

jury believed Zena and K.J. were engaged in mutual combat or that Zena started the fight, CALCRIM No. 3471 provided the actions Zena was required to take before being entitled to assert her right to self-defense. If the jury believed K.J. started the fight, the trial court's recitation of CALCRIM No. 3470 (Right to Self-Defense or Defense of Another (Non-Homicide)), CALCRIM No. 3472 (Right to Self-Defense: May Not be Contrived), and CALCRIM No. 3474 (Danger No Longer Exists or Attacker Disabled) provided the standards applicable. In reciting CALCRIM No. 3470, the court specifically reiterated that "[t]he People have the burden of proving beyond a reasonable doubt that a defendant did not act in lawful self-defense or defense of another." We may presume the jurors understood and followed the court's instructions. (*Sanchez, supra*, 26 Cal.4th at p. 852.)

Additionally, contrary to Zena's contention on appeal, the prosecution's argument would not have led a reasonable jury to misinterpret the self-defense standard. The prosecution argued that even if the jury believed that K.J. started the fight, Zena did not act in self-defense under CALCRIM No. 3474[4] because she continued to beat up K.J. after the dangerous keys she was concerned about had been taken from K.J. This scenario only applied if the jury rejected the mutual combat theory and, thus, ignored CALCRIM

---

4    CALCRIM No. 3474 instructs: "The right to use force in (self-defense/ [or] defense of another) continues only as long as the danger exists or reasonably appears to exist. [When the attacker (withdraws/ [or] no longer appears capable of inflicting any injury), then the right to use force ends.]"

11

No. 3471, which the trial court expressly instructed them they could do.[5] Likewise, if the jury thought the prosecution was arguing that CALCRIM No. 3474 applied to a mutual combat scenario, that misunderstanding would work in Zena's favor because it would suggest that she *retained* a right to self-defense during mutual combat even if she had not attempted to withdraw as required by CALCRIM No. 3471. Accordingly, viewing the challenged instruction in the context of the instructions as a whole, we conclude there is no reasonable likelihood the jury applied the instruction in an impermissible manner. (*Houston, supra*, 54 Cal.4th at p. 1229.)

DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

IRION, J.

CASTILLO, J.

---

[5] Pursuant to CALCRIM No. 200 (Duties of Judge and Jury), the trial court informed the jury that "[s]ome of these instructions may not apply, depending on your findings about the facts of the case. . . . After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

12